## Kentucky Fluorspar Company v. Pierce's Executors, et al.

### (Decided June 3, 1919.)

### Appeal from Crittenden Circuit Court.

1. Joint Tenancy—Sale and Division of Proceeds of Land.—One or more of several joint owners of a tract of mineral land may maintain an action for a sale of the property and a division of the proceeds where it is alleged that the property is not susceptible of division in kind.

2. Joint Tenancy—Action for Sale and Division of Proceeds.—The mere fact that real property is under lease, does not prevent the prosecution of an action for division of the property or a sale for division.

3. Joint Tenancy—Tenancy by Sufferance—Lease.—Where a lease on minerals was for the term of five years "from and after this date," and the lessee continued to operate the mines for several years after the termination of the five year period, it was a ten-

ancy by sufferance subject to be terminated at any time by the entrance of the cotenant, or by notice and demand for possession.

C. S. NUNN and A. C. MOORE for appellant.

JOHN A. MOORE for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

In November, 1901, J. P. Pierce, W. H. Crow, and Mrs. Mary J. Brown, were the owners of the mineral and certain mineral rights and easements in a tract of 100 acres of land, situated in Crittenden county, Kentucky. The surface of the land belonged to Mrs. Brown, and she owned a one-third undivided interest in the mineral also, and Pierce and Crow each owned a one-third undivided interest in the mineral. On November 23, 1901, they entered into a lease contract with the Kentucky Fluorspar Company, a corporation, whereby Pierce, Crow and Mrs. Brown leased and let the mineral in and under the tract of land described to the fluorspar company to be operated on a royalty basis, and said lease granted to the company certain easements and rights necessary to the mining and removing of the fluorspar; it also provided that the grantors "do hereby lease and rent and convey unto second party, its successors or assigns for a term of *five* years, from and after this date, the mines and minerals and mine rights and privileges in, and on and underlying the said land of the first parties, which is situated in Crittenden county, Kentucky, and bounded as follows (here follows the description)."

The lease also contains the following provisions: "Second party agrees to do their work on said lease in a mineral like way, considering the character and location of the minerals and beds or veins, and to timber well any shaft they may sink thereon.

"So long as second party may hold in its possession this title paper, or fail to give notice to first parties of its intention to surrender said land, then second party shall be liable for and shall pay each year a minimum guaranteed royalty of $50.00, whether said mines are working or not, and should second party fail to pay the royalties as stipulated herein, or fail in any material way to live up to this contract then first party shall have the right to declare a forfeiture and terminate it."

The Kentucky Fluorspar Company began to mine and operate for fluorspar on the premises described, and continued so to do from 1901 up until the bringing of this action in 1918. The royalties were paid from time to time, but not as provided in the contract, which is: "Second party agrees to pay first party as royalty the sum of fifty cents per ton of 2,000 lbs. on every ton of fluorspar that is hauled or shipped from said land. . . . Said party shall pay said royalties monthly as said minerals are shipped or hauled away, and during the months just after same is taken away.

"Beginning with January 1, 1902, second party guarantees to first parties that the royalties that may accrue during any one year while second party holds said land, shall not be less than $50.00 per year, that is, if the total royalty earned for any one year shall be less than $50.00, then the second party agrees to pay in addition to the earned royalty a sum sufficient to make it $50.00."

J. P. Pierce died in 19........., naming Mrs. Ella C. Pierce and C. J. Pierce executors of his will, with power to sell and dispose of his interest in the mineral rights referred to. In March, 1905, Mary J. Brown, widow, sold and conveyed her one-third undivided interest in the mineral in the tract of land named, to the Kentucky Fluorspar Company and in December, 1917, W. H. Crow conveyed his one-third undivided interest in the minerals mentioned to C. J. Pierce.

The lease contract made to the fluorspar company was not recorded and the grantors retained no copy thereof. After the death of J. P. Pierce an effort was made by his representatives to obtain a copy of the lease or to examine the original lease, but they were unable to see the lease or to know its contents, except that the general manager of the company assured Pierce's representative that the lease was still in full force and effect. While fifty cents per ton royalty was considered a fair price in that district in 1901, at the time the lease was made, fluorspar had in recent years greatly increased in value until the reasonable fair royalty was $6.00 per ton, in that district at the time of the commencement of this action. When C. J. Pierce, representing the estate of J. P. Pierce as well as himself, was permitted to see and read the lease contract and discovered that the lease was for a term of five years from November, 1901, he at once

declined to receive further royalties from the fluorspar company and demanded a surrender of the lease, but this was refused by the company and they continued to mine the fluorspar and to make out and offer to Pierce the royalty checks. C. J. Pierce and the representatives and heirs of J. P. Pierce, owners of a two-thirds undivided interest in the minerals aforesaid, instituted this action against the Kentucky Fluorspar Company as the owner of a one-third undivided interest in said minerals, for a sale of their joint property and a division of the proceeds according to their respective rights.

In the petition it is alleged that the minerals are not susceptible of division in kind without impairing the value of the whole property and of the plaintiffs' interest therein. The petition also alleges ''that the defendant company held a lease of some kind upon said property, but that same expired several years ago, and that defendants are removing large quantities of fluorspar from said property and selling and disposing of same.'' The title of the plaintiffs was set forth in detail and copies of the deeds were attached to and made a part of the petition. To the petition the defendant company filed special and general demurrers, each of which was overruled. Then came the defendant company and filed answer, set-off and counterclaim in which it set up and relied upon the lease contract which it alleged was in full force and effect as a bar to the rights of plaintiffs to have a division of the joint property, or a sale and a division of the proceeds. To this answer, set-off and counterclaim the plaintiffs filed a pleading styled, ''Reply and cross-petition,'' in which they also set up the lease contract and alleged that it had long since expired. In another paragraph of said reply it was alleged that the defendant company had violated the terms of the lease contract in material parts and had thereby forfeited said lease, and a cancellation of the lease was prayed.

Issue being joined and evidence heard, the court entered a decree cancelling the lease and holding it of no effect, and adjudged a sale of the lands for a division of the proceeds among the joint owners according to their respective rights. From this judgment the Kentucky Fluorspar Company appeals.

This is not a suit for the sale for division of lands, but only the mineral therein. Thornton on the Law of Oil and Gas, sec. 314, is as follows:

" 'The mere fact of joint ownership in a mine does not give an equitable right to a partition. Seldom can a division of a mine be made. Generally partition must result in a sale. To such property there is an unknown value; and a chancellor may well require full information as to all the relations of the parties to the property before decreeing any partition which will practically result in dispossessing one of the parties entirely.' And in a dictum in an Illinois case it was said: 'The mines, when opened, in their nature were indivisible. Neither partition could be made at law, nor dower assigned by metes and bounds. The only partition that can be made is to order a sale of the mines and divide the proceeds.' These were instances where the mines had been opened. Where the mine had not been opened, the right to partition of land having upon it solid minerals has been recognized; and it will be decreed unless the mineral is so situated that a probably fair division of it can not be made by dividing the surface of the land. All things being equal, as between a partition and a sale, a partition will be decreed. . . . It is manifest that partition can not be made by setting off the surface by metes and bounds, because the quantity and value of the mines and ores, and the capacity and facility of access for working them, bear no proportion to the area of the surface under which they lie. Indeed, in making partition at law, it has been found necessary to make special partition, directing the division of the profits, or the alternate enjoyment of the common property, as circumstances may require."

Lindley on Mines, sec. 792, page 1953, it is said:

" It is undoubtedly true that an actual division of a mine can rarely be made without doing a possible injustice to some one of the cotenants. Generally partition proceedings must result in a sale. . . . As an abstract proposition of law, a sale of a mine cannot be ordered in a partition suit, except in those cases where a partition would be manifestly injurious to the interests of cotenants. The general rule as to partition is stated as follows: The land should be partitioned in kind unless such partition can not be made without great prejudice to the owner. The courts favor a partition in kind where it is practicable, and this for the reason that the owners should not be deprived of their title through a sale unless

such sale is necessary to prevent great prejudice to the owners.''

It urged a reversal of the judgment upon the following grounds: (1) the petition failed to allège a forfeiture of the lease; (2) the petition does not show plaintiffs in possession of the property; (3) the trial court erred in permitting appellee to file a cross-petition with its reply, and in refusing to strike from plaintiff's reply and cross-petition the second paragraph thereof, because said paragraph set up an entirely new cause of action; (4) the court overruled appellant's motion to require plaintiffs below to elect which of the two inconsistent causes of action they would prosecute, whether the one for the sale of the property under section 490, Civil Code. or the one for a cancellation of the lease contract.

By provision 499 of the Civil Code one owning lands jointly with others "may file in the circuit court . . . of the county in which the land or the greater part thereof lies, a petition containing (a) a description of the land; (b) a statement of the names of those having an interest in it; (c) and the amount of such interest; (d) with a prayer for a division or allotment; and, thereupon all persons interested in the property who have not united in the petition shall be summoned to answer on the first day of the next term of the court. The written evidence of the title to the land, or copies thereof, if there be any, must be filed with the petition.''

Under section 490 of the Civil Code, a vested estate in real property jointly owned by two or more persons may be sold by order of a court of equity in an action brought by either of them, though the plaintiff or defendant be of unsound mind or an infant, if the estate be in possession and the property can not be divided without materially impairing its value, or the value of plaintiff's interest therein. Measured by these sections of the Code, the petition stated a cause of action which entitled the plaintiffs to a sale of the property and a division of the proceeds according to the respective rights of the joint owners in the absence of a showing to the contrary, and the trial court properly overruled the general demurrer to the petition. While brief for appellant does not state why the special demurrer was filed, the purpose no doubt was to raise the question of the capacity of parties plaintiff to sue, one of the plaintiffs being al-

leged to be under the age of 21 years.  But this objection was not well taken in any event, because all parties interested in the property are made parties, and by subsection 2 of section 499, Civil Code, the statutory guardian of an infant may file or unite in a petition in the name of and in conjunction with such infant.

(2)  As the plaintiffs and the defendant company were cotenants in the real property sought to be sold, the possession of the fluorspar company was the possession of the plaintiffs.  Moreover, the company was the tenant and lessee of the plaintiffs, and plaintiffs were, therefore, in the possession of the property.

(3)  The pleading styled "reply and cross-petition" does not come within either of the subsections of section 97 of the Civil Code, because it is an attempt on the part of the plaintiffs to state an additional cause of action against the defendant.  This should have been presented by an amended petition, but as the defendant company presented its lease as a defense to the action for a sale of the property and a division of the proceeds, it was permissible for the plaintiffs to reply thereto and to allege a termination of the lease.  The mere misnomer of the pleading does not necessarily render it demurrable or subject to be stricken.  "Where the answer contains new matter constituting a counterclaim or set-off, the plaintiff may reply to such new matter, denying each allegation controverted by him, or any knowledge or information thereof sufficient to form a belief; and may allege in concise language any new matter not inconsistent with the petition constituting a defense to the counterclaim or set-off."  Newman's Pleading and Practice, sec. 512a. Any matter properly presented by the answer may be traversed or avoided, and the party presenting the defense can not complain that in doing so the reply contained what was otherwise new matter.  In view of the conclusion we have reached upon the whole case, we do not regard this error important.

(4)  The trial court properly overruled the motion of appellant to require the plaintiffs below to elect which of the two causes of action it would prosecute, the one for a sale of the property and a division of the proceeds, or the one for a cancellation of the lease.  The lease was for a definite term of five years from and after its date, November 23, 1901.  The suit was not brought until in

1918, so that the term had expired several years before the suit was commenced; and the most that could be claimed by appellant was a tenancy by sufferance, which would have expired not later than at the end of the first year next after the demand for possession by the grantors. "The fact that the land of which partition is sought was or is subject to a lease is not a bar to the partition of the reversion." 20 R. C. L. 741.

The lease contract was for five years and gave appellant the right to mine and remove fluorspar from the premises during that period, provided the lease was not forfeited by the failure of the company to pay the royalties and otherwise perform the terms of the contract. The lessee had the right to enter on the leased premises and mine and remove fluorspar therefrom "for a term of five years, from and after this date (23rd of November, 1901)." The paragraph in the lease contract which provides "so long as second party may hold in its possession this title paper, or fail to give notice to first parties of its intention to surrender said lease, then second party shall be liable for and shall pay each year the minimum guaranteed royalty of $50.00 whether the said mines are worked or not, and should second party fail to pay the royalties as stipulated herewith, or fail in any material way to live up to this contract, then first party shall have the right to declare a forfeiture and terminate it," has reference to the five year term only and not to a period beyond the five years. . That is to say, the lessee had the right to surrender the lease and avoid liability for the royalties by surrendering the "title paper" at any time within the five years, but if it chose to hold the title paper or failed to give notice to first parties of its intention to surrender the lease, then it should be responsible for the royalties. whether it operated the mines or not. If, however, the lessee failed to pay the royalties as stipulated, or failed in any material way to live up to its contract, the lessors had the right to declare a forfeiture and terminate the lease; but without such declaration the lease terminated by its terms five years from its date. On its termination the lessee had no further right upon the premises except as it acquired such right by sufferance by remaining on the premises and continuing to mine fluorspar, but as appellant company had become a cotenant with appellees their tenancy was subject to be

terminated at any time by the entrance of either of the other cotenants.

As we understand the relation of the parties, the fact that the company had formerly held a lease on the premises for the production of the mineral was no defense whatever to an action for a sale of the property for a division of the proceeds. In all but exceptional cases, and this is not one, the lessee is not a necessary party to an action for partition or for a sale of land for a division of the proceeds among the cotenants. 30 Cyc. 211-226.

We apprehend that there is a very great difference between a tenancy by sufferance taking effect upon farm lands or even residential or business property, and on a lease such as the one under consideration for the mining and removal of mineral. A farmer in order to plant, cultivate and mature his crops must have the entire season, and if he is allowed to remain on the premises by sufferance until the planting season is past, he should by all standards of right be allowed to harvest his crops, which would require the remainder of the year. For a like reason, though not so imperative, may one who rents a dwelling or business house be allowed to keep the premises for the balance of the year after having held by sufferance for more than 90 days. This is provided by section 2295, Kentucky Statutes, but where one has a lease on the premises for a number of years, in which to take and remove mineral, and his lease expires, there is no good reason why he should be permitted to continue to hold the premises and take mineral for another term of years equal to the one first granted, or for any term greater than that fixed by section 2326, Kentucky Stat-. utes, for a tenancy by sufferance—thirty days—for he knows the end of his term, and is presumed to have calculated accordingly, and as he takes out the mineral by the ton or other unit, his continued stay upon the premises is not absolutely necessary, for each ton or unit is separate and independent of all others, and the period of 30 days fixed by the statutes would appear to be all that would be reasonably necessary in such case. If he desires a longer term he should obtain it by contract and not by the mere indulgence of the landlord. It is not necessary to decide and we do not decide this question in the determination of this appeal for the reason that a demand for surrender of the lease was made and this

action commenced.long enough ago to render the question of no consequence here.

The trial court correctly adjudged a sale of the property for a division of the proceeds among the joint owners, as their interests may appear.

Judgment affirmed.